

# NUMBER 13-12-00331-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**HENRY SCOTT BAKER,**                                                        **Appellant,**

**v.**

**REGENCY NURSING & REHABILITATION
CENTERS, INC., PORT LAVAC NURSING
AND REHABILITATION CENTER, INC.,
REGENCY NURSING CENTER PARTNERS
OF PORT LAVACA, LTD., TIMOTHY
MCFARLAND, M.D., AND DON PAUL
BUNNELL, M.D.,**                                                        **Appellees.**

## On appeal from the 24th District Court
## of Calhoun County, Texas.

## MEMORANDUM OPINION ON REHEARING

### Before Chief Justice Valdez and Justices Benavides and Longoria
### Memorandum Opinion on Rehearing by Chief Justice Valdez

After considering appellee, Don Paul Bunnell, M.D.'s, motion for rehearing, we deny the motion; however, we withdraw our opinion and judgment of July 25, 2013, and substitute the following.

Appellant, Henry Scott Baker's deceased father, Henry Herbert Baker (the "deceased"), was a patient of appellees, Regency Nursing and Rehabilitation Centers, Inc., Port Lavaca Nursing and Rehabilitation Center, Inc., Regency Nursing Center Partners of Port Lavaca, Ltd., Timothy McFarland, M.D., and Don Paul Bunnel, M.D. Baker appeals from the trial court's order dismissing his cause of action against appellees. By six issues, which we have renumbered and reorganized, Baker contends that the trial court abused its discretion by: (1) ruling that Baker's expert was not qualified to render an expert report; (2) considering and relying on information outside the four corners of the expert report and "effectively" granting summary judgment in favor of appellees; (3) finding that the expert report was deficient; and (4) incorrectly concluding that the statute of limitations had expired when Baker filed suit. We reverse and remand.

## I. BACKGROUND

The deceased died on June 15, 2009 at the Port Lavaca Nursing and Rehabilitation Center ("PLNRC"). On August 10, 2011, Baker filed suit against appellees claiming that appellees had negligently violated the standard of care and had violated the requirements of the Texas Nursing Home Regulations because appellees failed to ensure that the deceased: (1) "did not develop pressure sores unless his clinical condition demonstrated that pressure sores were unavoidable"; (2) was provided the "necessary treatment and services to promote healing, prevent infection and prevent

2

new sores from developing, when [the deceased] developed pressure sores"; (3) "received appropriate treatment and services to correct any mental or psychological adjustment difficulty"; (4) "received adequate supervision and assistive devices to prevent accidents"; (5) "maintained acceptable parameters of nutritional status, such as body weight and protein levels, unless his clinical condition demonstrated that was not possible, and required [PLNRC] to ensure that [the deceased] received a therapeutic diet when there was a nutritional problem"; (6) was "free of" any "unnecessary drugs"; and (7) "received gradual dose reductions for the anti-psychotic drugs that [appellees] prescribed to him and behavior interventions, so that [the deceased] could discontinue use of the may anti-psychotic and psycho-active medications which [appellees] used to control [the deceased's] behavior." Baker claimed that appellees and their employees, acting within the course and scope of their employment, negligently failed to provide the proper level of care to the deceased. Baker stated that "as a sole, direct, and proximate result of [appellees'] negligence, and their agents or employees" the deceased suffered: (1) "large ulcerous wounds that required hospitalization and amputation, extreme pain and suffering, loss of enjoyment of life and his death"; (2) "malnutrition that caused extreme pain and suffering, loss of enjoyment of life and his death"; and (3) "confusion, diminished mental capacity, loss of the ability to speak and communicate, depression, anxiety, fear, extreme emotional distress and loss of enjoyment of life." Baker accused the appellees of causing the deceased's death by the following allegedly negligent acts and omissions: (1) providing "inadequate assessment, evaluation, and management of the effect on [the deceased's] health from the combination of anti-depressant, anti-psychotic, psycho-active, and other medications that were being administ[ered]"; (2)

3

causing the deceased "to become overmedicated"; (3) failing to maintain "a proper regimen of exercise, physical therapy, nutrition, skin care, and personal hygiene for [the deceased]"; (4) administering medications to the deceased "for the convenience of [appellees], who otherwise would have been required to spend more time and energy in caring for and treating [the deceased]"; (5) permitting "the life-threatening conditions suffered by [the deceased] to deteriorate without rendering appropriated remedial or curative treatment, despite knowing that if these conditions continued for any length of time these conditions would pose a sever threat to [the deceased's] health and life"; (6) refusing "to take appropriate action necessary to prevent the deterioration of the life threatening conditions"; and (7) failing to "timely and appropriately order diagnostic and/or laboratory tests, medical procedures and/or other intervention or treatments that could have spared [the deceased's] right leg and life, including but not limited to peripheral vascular testing to determine whether he suffered from arterial or venous insufficiency, and/or arterial or venous grafts or other procedures to restore or increase blood flow into his limbs."

Baker filed an expert report from Lige Rushing, M.D. on November 18, 2011. Appellees objected to the report for a variety of reasons. The trial court ordered a supplemental report. After Baker filed a supplemental report, appellees again objected to Dr. Rushing's report arguing that the report did not sufficiently advise them of the nature of Baker's claims, that Baker's claims were barred by the statute of limitations, and that the deceased's sores were "unavoidable."[1] The trial court granted appellees' objections and dismissed the case. This appeal followed.

---

[1] Appellees did not file any expert reports or affidavits supporting their arguments.

4

## II. Standard of Review and Applicable Law

We review the trial court's decision on a motion to dismiss a health care liability claim under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877–78 (Tex. 2001). "An abuse of discretion occurs when a trial court acts in an arbitrary or unreasonable manner or without reference to any guiding principles." *Moore v. Sutherland*, 107 S.W.3d 786, 789 (Tex. App.—Texarkana 2003, pet. denied) (citing *Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex. 1999)). We may not reverse for abuse of discretion simply because we would have decided the matter differently. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985).

We may not substitute our judgment for that of the trial court concerning the resolution of factual issues or matters committed to the trial court's discretion. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992). The appellant must "establish that the trial court could reasonably have reached only one decision." *Id.* at 840. A trial court has no discretion in determining what the law is or in applying the law to the facts and "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Id.*

Section 74.351 requires a plaintiff to serve on each defendant physician or health care provider whose conduct is implicated by a healthcare liability claim a curriculum vitae of each expert listed in the report and one or more expert reports setting forth the standard of care, breach of the standard of care, and causation. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (r)(6) (West 2011). An "expert report" is defined as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of

5

care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6).

A court must grant a motion to dismiss under section 74.351(b) if, after the 120-day deadline has passed, it appears to the court that the report does not represent an objective, good-faith effort to comply with the definition of an expert report. *Id.* § 74.351(l). A "good-faith effort" means that the report "provide[s] enough information to . . . inform the defendant of the specific conduct the plaintiff has called into question . . . [and] a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 879. A report cannot constitute a good-faith effort if it omits any of the statutory requirements. *Id.*

### III. OBJECTIONS TO DR. RUSHING'S QUALIFICATIONS

By his first issue, Baker contends that the trial court abused its discretion in finding that Dr. Rushing was not qualified to file an expert report. Specifically, appellees challenged Dr. Rushing's report in the trial court on the basis that he was not qualified to opine regarding causation. [2]

Not every licensed physician is always qualified to testify on every medical question. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). Therefore, the focus should not be on whether the expert is a physician and instead should be on the medical expert's "knowledge, skill, experience, training, or education" concerning the specific issue before the court which would qualify the expert to give an opinion on that

---

[2] We note that on appeal, appellees do not address this issue.

6

particular subject. *Broders*, 924 S.W.2d at 153–54 (applying Texas Rule of Evidence 702).

In his report, Dr. Rushing stated that he is a practicing physician licensed by the State of Texas and that he received his M.D. Degree from Baylor University College of Medicine in Houston, Texas. Dr. Rushing received his "specialty training in internal medicine and rheumatology at the Mayo Clinic" in Rochester, Minnesota. Dr. Rushing is board certified in internal medicine, rheumatology, and geriatrics. Dr. Rushing stated that "at the time of the occurrence of this case, [he] was actively engaged in the practice of internal medicine, rheumatology, and geriatrics" and that he has continued "to actively practice in these specialties as of [November 17, 2011, the date he wrote his report]." Dr. Rushing stated that in order to write his report, he reviewed records from Memorial Medical Center and PLNRC, the deceased's death certificate, Baker's petition for damages, Dr. McFarland's answer, PLNRC's answer, and Dr. McFarland's office records from Coastal Medical Center.

Our review of Dr. Rushing's curriculum vitae shows that at the time of the lawsuit, he was certified by the American Board of Geriatrics, the American Board of Independent Medical Examiners, the American Board of Internal Medicine, and the American Board of Rheumatology. Dr. Rushing was also an attending physician at Presbyterian Hospital of Dallas, Texas. Dr. Rushing was also a member of, among other organizations, the American Geriatric Society.

In his report, Dr. Rushing explained the methodology that he used to formulate his opinions regarding the standard of care, the breach of the standard of care, and causation. Dr. Rushing stated that he evaluated whether "breaches in the standards of

7

care resulted in any injury to [the deceased]" by employing the "generally accepted method for evaluating whether or not a long-term care facility, a hospital, or a physician's care and treatment of a patient met or fell below the accepted standards of care." Dr. Rushing stated that his opinions were based on his "review of the pertinent medical records, [his] education, training, and experience as a practicing board certified internist, geriatrician, and rheumatologist and [his] knowledge of the accepted medical and nursing standards of care for the diagnoses, care, and treatment of the illnesses, injuries, and conditions involved in this claim."

In his report, Dr. Rushing set out the complex nature of the deceased's medical conditions upon admission to the nursing home in this case and explained that "in the regular course of [his] medical practice" he has examined, diagnosed, and treated "patients with complaints and diseases similar or identical" to the complaints and diseases suffered by the deceased. Dr. Rushing stated:

> During the course of my career, I have served as a primary care physician for more than 10,000 hospitalized and nursing home patients. I have had patients who were at high risk for pressure ulcer development like [the deceased]. I have written orders for the prevention and the treatment of pressure ulcers such as [the deceased] had. I have supervised the execution of these orders by LVNs, RNs, [and] CNAs who were assigned to provide the hands-on nursing care for my patients. I am therefore intimately familiar with the standards of care for the RNs, LVNs, and CNAs who were providing hands-on care for [the deceased].

As set out above, Dr. Rushing is licensed to practice medicine in Texas. He is board certified in internal medicine and geriatrics and is actively engaged in the practice of these specialties. He regularly engages in the diagnosis and treatment of patients who have similar or identical conditions to those suffered by the deceased. Finally, Dr. Rushing stated that he has treated patients in nursing homes and patients with a high

8

risk of pressure ulcers and patients who have pressure ulcers. We conclude that Dr. Rushing has the "knowledge, skill, experience, training, or education" to opine on the issue before the trial court on whether the appellees' alleged breach in not providing appropriate wound care to the deceased caused his pressure ulcers, caused the pressure ulcers to become worse, and caused his eventual death.[3] Therefore, the trial court abused its discretion if it determined that Dr. Rushing was not qualified to opine regarding causation. We sustain Baker's first issue.

## IV. OBJECTIONS TO ADEQUACY OF DR. RUSHING'S REPORT

Next, by his second issue, Baker contends that the trial court relied on information that was not contained within the four corners of the expert report and essentially granted summary judgment in favor of appellees without proper discovery.[4] Appellees respond that Dr. Rushing's report failed "to address the [deceased's] medical reports that indicated the ulcers were unavoidable and the [the deceased] was being given palliative care. . . . ."[5] Thus, according to appellees, "Dr. Rushing dodged the critical medical causation issue determinative of whether the case is meritorious."[6] By his third issue, Baker contends that Dr. Rushing's report is sufficient.

---

[3] We note that the death certificate states that the deceased died as a result of Alzheimer's, malnutrition, and wounds contractures.

[4] Baker alleges that the trial court relied on the deceased's medical records when determining whether Dr. Rushing's report was sufficient. We note that according to Baker the medical records consist of over 2,000 pages.

[5] Appellees cited *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997) to support their argument that an expert report requires that the expert rule out other possible causes of the patient's injury. However, *Havner* concerns the reliability of an expert's testimony at trial pursuant to an objection under rule of evidence 702. *See id.* *Havner* does not concern an expert's report submitted to satisfy section 74.351. Appellees do not explain how *Havner* should apply to an expert report submitted to satisfy section 74.351, and we conclude that *Havner* does not apply in this context.

[6] On appeal, appellees cite the same cases cited to the trial court which deal with exclusion of expert testimony pursuant to rule of evidence 702. Appellees did not acknowledge in the trial court and on appeal that their arguments relate to testimony at trial being excluded under rule 702. Moreover,

9

## A. Other Causes

Appellees complained to the trial court that Dr. Rushing failed to consider the deceased's medical records that state that the ulcers were unavoidable because of other possible causes.[7] However, whether the ulcers were unavoidable is a defensive theory that must be supported by the evidence presented at trial, and constitutes a question of fact for the jury to determine.[8] *Wisenbarger v. Gonzales Warm Springs Rehabilitation Hospital*, 789 S.W.2d 688, 690 (Tex. App.—Corpus Christi 1990, writ denied) (stating that "[i]n a medical negligence case, when expert testimony establishes that another physical condition or circumstance was the probable cause of the injury, the definition of unavoidable accident must immediately follow the jury instruction defining proximate cause" and that an "[u]navoidable accident [definition] is to be

---

appellees did not argue to the trial court and do not argue on appeal that rule 702 applies to an expert report filed pursuant to section 74.351.

[7] The issue of "unavoidable accident" can be raised in cases involving medical negligence. For example, in *Wisenbarger v. Gonzales Warm Springs Rehabilitation Hospital*, a paraplegic patient sued the treating health care provider because he developed "a bed sore, or decubitus ulcer" on his spine while being treated. 789 S.W.2d 688, 690 (Tex. App.—Corpus Christi 1990, writ denied ). The jury charge included an unavoidable accident instruction. *Id.* at 691–92. We stated, "An instruction on unavoidable accident is properly submitted if any evidence shows that neither party proximately caused the incident in question." *Id.* at 92. We further explained that "in this case, in order for an instruction on unavoidable accident to be proper, there must have been some evidence offered by an expert, or evidence from which inferences could be made, that it was probable that Wisenbarger's decubitus ulcer was not proximately caused by the negligence of any party but was instead caused by some other physical condition or circumstance." *Id.*

[8] *See Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006) (explaining that unavoidable accident is not an alternative theory of liability but is "an inferential rebuttal issue that requires plaintiffs to prove the nonexistence of an affirmative defense . . ."; and must be raised by the evidence before the definition is included in the jury charge); *Lemos v. Montez*, 680 S.W.2d 798, 800 (Tex. 1984) (citing *Dallas Ry. & Terminal Co. v. Bailey*, 250 S.W.2d 379, 380, 151 Tex. 359 (Tex. 1952)) ("[I]f the evidence does not raise the issue that something other than the negligence of one of the parties (to the event) caused the injuries, then it does not raise the issue of unavoidable accident" and if "[u]navoidable accident was not raised by the evidence in this case . . . the court erred in giving the instruction."); *see also Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 433 (Tex. 2006) (stating that unavoidable accident instruction informs jury it may consider causes of occurrence other than negligence of parties, including causes such as obstruction of view); *Harris v. Vazquez*, No. 03-07-00245-CV, 2008 Tex. App. LEXIS 4117, at *15 (Tex. App.—Austin June 5, 2008, no pet.) (documenting that the jury found no liability on either driver where the trial court submitted unavoidable accident instruction because one driver testified that his view was obstructed).

submitted [to the jury] when there is a possible causal effect of some physical condition or circumstance, or when one of the parties to the event is incapable of negligence."). Here, we are examining the sufficiency of an expert report pursuant to section 74.351. At this stage of the proceeding, no evidence has been presented, and a plaintiff is neither required, nor expected, to present evidence in the report as if it were actually litigating the merits. *Palacios*, 46 S.W.3d at 879. The report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the following elements: (1) standard of care; (2) breach; and (3) causal relationship. *Bowie*, 79 S.W.3d at 53. There is nothing in the statute requiring the plaintiff to address the unavoidability of the patient's condition, negate other causes of the patient's injury, or that allows the trial court to engage in such a fact-specific inquiry. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *Palacios*, 46 S.W.3d at 878–79; *Bowie*, 79 S.W.3d at 53. Therefore, Dr. Rushing was not required pursuant to section 74.351 to address whether the pressure ulcers were unavoidable or rule out or negate other possible causes of the deceased's pressure ulcers and ultimate death. [9]

Moreover, appellees cite no authority and we find none supporting a conclusion that an expert report filed pursuant to section 74.351 must negate other possible causes of the patient's injury or address whether the injury is unavoidable. Therefore, the trial court abused its discretion when it determined that Dr. Rushing's report is insufficient under section 74.351 on this basis. We sustain Baker's second issue.

---

[9] We note that Dr. Rushing stated in his report that the deceased's pressure ulcers were avoidable. Moreover, if the expert believed that the injury was unavoidable or that something else caused the injury, the expert would not write a report stating that the health care provider caused the injury.

11

**B. The Adequacy of Dr. Rushing's Report**

By his third issue, Baker contends that Dr. Rushing's report met the requirements of section 74.351 because it provided appellees with sufficient notice of the applicable standards of care, appellees' breaches of those standards, and causation. Appellees respond that "[t]he only opinion expressed by Dr. Rushing's second report is: '[The deceased's] pressure ulcers on his heel and sacral area were proximate causes of his death.'" Appellees claim that Dr Rushing does not "mention[] any other condition, factor or conduct which he contends is a proximate cause of [the deceased's] death."[10]

Dr. Rushing indicated that based on his review of the medical records, when the deceased entered the appellees' facility, he did not have any pressure ulcers; specifically, he did not have any "heel ulcers or sacral/coccyx ulcers." Dr. Rushing stated that the deceased developed these ulcers while he was appellees' patient. Dr. Rushing opined, "Based on the comprehensive assessment of the resident, the facility must ensure that a resident who enters the facility without pressure sores does not develop [them] unless the individual's clinical condition demonstrates that they were unavoidable and that a resident having pressure sores upon admission receive the

---

[10] Appellees appear to acknowledge that Dr. Rushing's report addresses causation in their brief by stating, "Dr. Rushing ties his opinion with regard to the ulcers being a proximate cause of the death of [the deceased] with the conduct of [appellees] by saying that [appellees] failed to prevent the development of the pressure ulcers" and "Dr. Rushing equates his contention that the pressure ulcers were a proximate cause of [the deceased's] death to the notion that alleged negligence by physicians was a proximate cause of [the deceased's] death." However, appellees claim that Dr. Rushing failed to state that they "actually caused" the ulcers or that they caused the deceased's death. Appellees complain that Dr. Rushing merely stated that they "failed to prevent the ulcers" and "[t]his is particularly significant because the ulcers were clinically unavoidable." However, we have already concluded that Dr. Rushing was not required to address whether the pressure ulcers were unavoidable. Moreover, in Dr. Rushing's opinion the pressure ulcers were avoidable. Appellees direct the Court to review thirty-three pages of the deceased's medical records. Although we have reviewed the medical records cited, we decline to rely on appellees' own statements in the medical records to conclude that the deceased's wounds were unavoidable because our duty is to examine Dr. Rushing's report and to determine whether it is a good-faith effort to comply with section 74.351.

12

necessary care, treatment, and services to promote healing, prevent infection, and prevent new sores from developing." According to Dr. Rushing, the deceased's "clinical condition did not demonstrate that [his] pressure ulcers were unavoidable" and the clinical condition did indicate that "he was at high risk for the development of pressure ulcers" due to his peripheral vascular disease, which impairs "arterial circulation to the legs and feet."

Dr. Rushing opined that due to the deceased's clinical condition, the standard of care required the nursing personnel and doctors "caring for patients like [the deceased] with these problems" to ensure that "there is not pressure on the heels." Dr. Rushing stated this is best achieved by utilizing a foam rubber pad that is placed under the patient's lower leg. Dr. Rushing opined that in this case, the standard of care "required that the Nursing Home and its staff provide effective pressure ulcer prevention program" consisting of, but not limited to, "regular scheduled skin checks, documented turning and repositioning protocol every two hours." According to Dr. Rushing, the protocol was not followed. Dr. Rushing stated that the standard of care required that the deceased's pressure ulcers be relieved. Dr. Rushing said, "The standard of care also requires that appropriate wound documentation and wound descriptions be provided on a regular and consistent basis so that one can assess whether the wound is getting better or worse or just how it has responded to treatment." Dr. Rushing stated that proper documentation as set out in his report was not done in this case. Dr. Rushing opined that the standard of care required medical directors of the nursing home such as Drs. McFarland and Bunnell to ensure that the deceased had been "turned and repositioned appropriately

13

every two hours and that he had proper pressure relief for his heels and skin checks." This was not done for the deceased according to Dr. Rushing.

Dr. Bunnell asserts "that dismissal was [not] proper to him because [he] did not provide medical treatment or medical care to Mr. Baker, nor did he ever have any contact with Mr. Baker." Dr. Bunnell also states that Dr. Rushing's report does not "address how [he] breached the standard of care for a medical director or explain how anything [he] did or did not do specifically caused Mr. Baker's death . . . ." Finally, Dr. Bunnell claims that in our withdrawn memorandum opinion, this Court misstated the expert's opinion that "the standard of care required medical directors [including Dr. Bunnell] to ensure that the deceased [Mr. Baker] had been 'turned and repositioned appropriately every two hours and that he had proper pressure relief for his heels and skin checks.'"

Appellant's petition characterizes Drs. McFarland and Bunnell as both being medical directors of the nursing home where the deceased suffered his alleged injury.[11] In his expert report, Dr. Rushing stated that:

> The standard of care for Dr. Timothy McFarland and Dr. Don Paul Bunnell required that they provide that level of care and treatment reasonable, prudent physicians would provide under the same or similar circumstances. As medical directors of the nursing home, the standard of care required that they [Drs. McFarland and Bunell] provide the coordination of medical care in the facility. The medical directors' "coordination role' means that the medical director is responsible for assuring that the facility is providing appropriate care as required. This involves monitoring and insuring implementation of a resident care policies [sic] and providing oversight and supervision of physician services and the medical care of the residents. It also includes having a significant role in overseeing the overall clinical care of patients to ensure [sic] to extend possible care is adequate. When the medical director identifies or receives the report of possible inadequate medical care including drug

---

[11] Appellant's petition also states that Dr. McFarland was the deceased's treating physician.

14

irregularities, he or she is responsible for evaluating the situation and taking appropriate steps to try to correct the problem. This may include any necessary consultation with the resident and his or her physician concerning care and treatment. The medical directors' coordination role also includes ensuring the support to essential medical consultations as needed.

The standard of care also requires that the physician provide and/or supervise the provision of a pressure ulcer prevention program as described earlier in this report. . . . It is . . . the physician's responsibility to see that such a program is in place and functioning properly. In this case, the standard of care requires that the doctors [McFarland and Bunnell] see to it that Mr. Baker [the deceased] was indeed being turned and repositioned appropriately every two hours and that he had proper pressure relief for his heels and skin checks as previously described.

The standard of care for the doctors [McFarland and Bunnell] also requires that they have an effective pressure ulcer treatment program. This has been described previously in this report. The ulcer treatment program should consist of regular turning and repositioning with documentation, pressure relief of the heels and any other pressure areas by means of special boots, special mattresses, special wedges, pillows, and devices to relieve pressure on the various body parts. The standard of care also require[s] that the doctors see to it that the nursing home keep[s] appropriate clinical records upon which the doctors can rely to assess the clinical status of the patient, and in this case assess the progress or lack of progress as relates to [the deceased's] pressure ulcer on his heel and his hip.

In his supplemental report, Dr. Rushing stated, "The care and treatment rendered to [the deceased] by Drs. McFarland and Bunnell fell below the accepted standard in the following ways:" (1) "Failed to prevent the development of pressure ulcers"; (2) "Inappropriately administered medications;" (3) "Failed to keep appropriate clinical records"; and (4) "Failed to properly assess [the deceased]."

As we understand the above-quoted portions of Dr. Rushing's report, Dr. Rushing believed that the standard of care required Dr. Bunnell to provide that level of care and treatment reasonable, prudent physicians would provide under the same or similar circumstances and that the standard of care required for doctors in Dr. Bunnell's

15

circumstances to ensure that the deceased received proper care for his ulcers. Dr. Rushing also stated that the standard of care required that Dr. Bunnell ensure that a proper ulcer treatment program was in place. Throughout his report, Dr. Rushing explained how the appellees, including Dr. Bunnell, failed to provide the proper care for the deceased's ulcers. Moreover, Dr. Rushing opined that the standard of care required that Dr. Bunnell ensure that the deceased had been "turned and repositioned appropriately every two hours and that he had proper pressure relief for his heels and skin checks." According to Dr. Rushing's report, Dr. Bunnell had failed to do so. Thus, this Court concludes that Dr. Rushing set out what standard of care Dr. Bunnel should have followed and how Dr. Bunnell breached that standard of care. Finally, Dr. Rushing stated that he believed that the failure to provide proper care to the deceased's wounds lead to a variety of injuries cumulating in the deceased's death. Accordingly, we conclude that Dr. Rushing's report provided a "fair summary" of the standard of care Dr. Bunnell was required to follow and how he breached it. *See Palacios*, 46 S.W.3d at 880 (explaining that a "fair summary is something less than a full statement of the applicable standard of care and how it was breached" but must "set out what care was expected, but not given").

Dr. Rushing opined that the standard of care "requires that a long-term facility must neither accept nor retain a resident whose needs they cannot meet" and that once it was evident to the nursing home staff that the deceased's "pressure ulcer on his heel was getting progressively worse and that it was getting progressively worse because of the failure to relieve the pressure on his heel. What should have been done is that the nursing home and its staff should have notified the family and the attending physicians

16

that they were unable to meet [the deceased's] needs" and the appellees should have transferred the deceased "to a facility where a high level of care would be made available and his needs could be met." Dr. Rushing opined that the failure to transfer the deceased to a facility better capable of dealing with the deceased's wounds resulted in "the progressive worsening of his heel pressure ulcer." Dr. Rushing concluded that the worsening of the pressure ulcers led to a lack of blood supply leading to necrotic or decayed tissue, which then became infected. Dr. Rushing explained in specific detail the process leading to decaying of the tissue which then led to infection and higher caloric requirements. Dr. Rushing stated that because of the enlarging of the pressure ulcer due to lack of care, the deceased's caloric requirement increased "by as much as 80%" which meant, the deceased's caloric requirement was "approximately 2400 calories."

It is Dr. Rushing's opinion that all appellees breached their respective standards of care by not properly caring for the pressure ulcers especially in light of the fact that the deceased suffered from conditions, such as the peripheral vascular disease, that caused him to be particularly susceptible to avoidable complications such as pressure ulcers. Dr. Rushing faulted the nurses and doctors for not utilizing the foam rubber pad, for not turning or repositioning the deceased in order to relieve the pressure to his hip and foot, for not properly documenting the wound care given, for not preventing the ulcers in the first place, and for allowing the ulcers to become infected.

Dr. Rushing further determined that appellees failed to prevent the pressure ulcer on the deceased's heel, relieve the pressure on the deceased's heel once the pressure ulcer developed, and that if the appellees had relieved the pressure to the deceased's

17

heel and sacral area as per the standard of care the deceased would not have developed the pressure ulcers in the first place. According to Dr. Rushing, the proximate cause of the deceased's pressure ulcers was the lack of proper pressure relief, which the appellees had a duty to do but failed to do. Dr. Rushing opined that the deceased sacral pressure ulcer developed as a result of the appellees' failure to turn and reposition the deceased every two hours. Dr. Rushing believed that if the deceased had received the proper wound care, the sacral pressure ulcers would not have developed.

Dr. Rushing stated that in his opinion, the pressure ulcers on the deceased heel and sacral area were the proximate causes of his death. Dr. Rushing explained:

> As described in my original chapter 74 report the large sacral pressure ulcer coupled with the gangrene of the right foot due to the pressure ulcer of his heel and the above the knee amputation of his right leg all increased his caloric requirements to at least 2400 cal per day. He was unable to take enough oral nourishment to meet this requirement. He did not receive TPN or enternal [sic] feedings. His caloric requirement was simply not met and as a result he consumed his own body tissues resulting in a cachectic state with his weight ultimately being approximately 116 pounds. If he had not had the large sacral pressure ulcer and and [sic] his heel ulcer and his amputation then he would not have had this excess caloric requirement. In the absence of this excess caloric requirement he was able to consume enough calories to maintain his weight. I do agree with the diagnosis on his death certificate that malnutrition and wounds, meaning pressure ulcers, were contributing factors to his death and were proximate causes of his death due to the mechanisms described in this report and in my chapter 74 report.

Dr. Rushing then expressed his ultimate conclusions: "It is my opinion that the failures outlined in this report proximately caused [the deceased's] death. Had it not been for these failures, [the deceased] would not have died when he did."

Finally, Dr. Rushing believes that had the deceased been given the proper wound care, he would not have needed an amputation of his leg, and he would not have

18

died due to the pressure ulcers. Dr. Rushing opined that had the foam rubber pad been utilized, the deceased would not have developed an ulcer on his heel. Dr. Rushing also believed that the lack of proper documentation of the wound care led to an "inability to assess accurately whether [the] ulcer was getting better" and that it is obvious that the ulcers became progressively worse due to the lack of proper wound care. Dr. Rushing opined that the nursing home failed to transfer the deceased to a facility able to provide appropriate care to prevent the development of pressure ulcers and that failure caused the pressure ulcers to develop and worsen.

In *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013), the Texas Supreme Court stated that it has "opined that one purpose of the report requirement is to expeditiously weed out claims that have no merit" and "that the purpose of evaluating expert reports is to deter frivolous claims, not to dispose of claims regardless of their merits." Thus, "[i]f a health care liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous." *Id.* "In sum, an expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements, and the trial court must not dismiss in such a case." *Id.* at 632.

Here, an examination of Dr. Rushing's report shows that he set out the standard of care for each appellee, how each appellee breached the standard, and he opined regarding causation. A report that omits any of the statutory requirements cannot constitute a good-faith effort; however, in this case, Dr. Rushing did not omit any of the statutory requirements. The report in this case provided enough information to inform

19

appellees of the specific conduct that Baker called into question and to support a conclusion that the claims have merit.

Dr. Rushing explained that appellees had a duty to prevent and properly treat the deceased's pressure ulcers and that they had failed to do so. Dr. Rushing further explained that because of the lack of the proper wound care, the deceased developed serious complications and eventually died from the lack of the proper wound care. We conclude that Dr. Rushing's report contained at least one viable theory of liability and that Dr. Rushing's report met the standards required under section 74.351. *See Potts*, 392 S.W.3d at 630. Thus, because Baker's claim is not frivolous, the trial court abused its discretion by dismissing Baker's claim on the basis that it did not comply with section 74.351(r)(6). *See Palacios*, 46 S.W.3d at 877–78. We sustain Baker's third issue.

## V. STATUTE OF LIMITATIONS

By his fourth issue, Baker contends that the trial court abused its discretion in determining that Dr. Rushing's report was deficient because the statute of limitations had expired. Appellees respond that the report is deficient because it "fails to indicate that there is a valid and meritorious cause of action, insofar as the dates relied upon for the care given reveal that the only conduct complained of occurred beyond the statute of limitations."

Section 74.351 does not include any requirement regarding the statute of limitations. Appellees cite no authority, and we find none, allowing a defendant in a health care liability claim to contest the sufficiency of an expert report based on the expiration of the applicable statute of limitations. Appellees merely invite this Court to conclude that because the statute says that "the report must provide a basis for the trial

20

court to conclude that the claims have merit," the trial court may find the expert report insufficient on the basis that the statute of limitations has expired. We decline appellees' invitation. Therefore, we conclude that the trial court abused its discretion by finding Dr. Rushing's report insufficient on the basis that the statute of limitations had allegedly expired.[12] We sustain Baker's fourth issue.

## VI. CONCLUSION

We reverse the trial court's dismissal and remand the cause for further proceedings consistent with this memorandum opinion.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
24th day of October, 2013.

---

[12] We make no determination regarding whether the statute of limitations had expired and note that Baker claims the statute of limitations has been tolled because the deceased was incapacitated when he died.